# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# ST. JOSEPH DIVISION

| | |
|---|---|
| SCI LODGING GROUP, LLC, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 21-06010-CV-SJ-LMC |
| K & J REPRESENTATIVES, LLC, | ) |
| Defendant. | ) |

## ORDER

Pending before the Court is Defendant's Daubert Motion to Exclude the Testimony and Opinions of Ghattas Bitar. (Doc. #19.) Defendant requests an order excluding the opinion and testimony of Ghattas Bitar, the Plaintiff's retained expert. The parties have not requested a hearing and this Court finds that a hearing is not necessary. *See Miller v. Baker Implement Co.*, 439 F.3d 407, 412 (8th Cir. 2006) (finding that "the basic requirement under the law is that the parties have an 'opportunity to be heard before the district court makes its decision.'")

### I. Background

Plaintiff owns a hotel in St. Joseph, Missouri. (Doc. #1-1 at 1, ¶¶ 5,6.) In the Spring of 2018, Plaintiff purchased a Radial 8 Eliminator bed bug heater (the Heater), "that was designed, manufactured, and sold by Defendant." (Doc. #1-1 at 2, ¶7.) Plaintiff further alleges that on June 2, 2019, the maintenance staff at the hotel set up the Heater in Room #362 of the hotel. (Doc. #1-1 at 2, ¶8.) According to Plaintiff, maintenance staff set the maximum temperature on the Heater to 135 degrees Fahrenheit, as directed by Defendant's instructions. (Doc. #1-1 at 2, ¶9.) Plaintiff alleges that on "June 3, 2019, the sprinkler system in Room #362 activated, which resulted in extensive water damage to multiple rooms throughout the Property." (Doc. #1-1 at 2, ¶10.)

Plaintiff's insurer, EMC Insurance, hired Ghattas Bitar, a Senior Technical Consultant with Independent Forensic Investigations Corporation (IFIC) to conduct testing on the Heater. (Doc. #20-2 at 1, 3; Doc. #21-1 at 2:1-3; Doc. #21-2 at 1, 3.) Mr. Bitar, who has a Bachelor of Science degree in electrical engineering, has "over 17 years experience providing investigative engineering services to the insurance, legal and corporate communities in matters of high-technology and complex losses, fire origin and cause, equipment failure analysis, scope of damage assessment and causation analysis." (Doc. #21-4 at 1.) After obtaining background information from staff at the hotel, Mr. Bitar "wanted to see if the [H]eater would continue to operate and raise the temperature in the space next to it[.]" (Doc. #21-1 at 5:24-25.) Multiple tests of the Heater were run at IFIC lab which showed the Heater continued to run at 138 degrees. (Doc. #20-1 at 8:12-16; Doc. #20-2 at 2; Doc. #21-1 at 6:19-25; Doc. #21-2 at 2.) Nevertheless, Mr. Bitar determined that the tests were inconclusive because the "temperature in the room at IFIC's lab could not be properly measured since it was not a completely tight and controlled environment." (Doc. #20-2 at 2; *see also* Doc. #20-1 at 6:21–8:17.) Mr. Bitar then arranged for the Heater to be tested at Element a specialized lab for testing in an environmental chamber which is designed "to measure specifically the temperature at the element itself and the environment around the [H]eater itself." (Doc. #20-1 at 9:10-18; Doc. #20-2 at 2; Doc. #21-1 at 8:3-7, 9:13–10: 17; Doc. #21-2 at 2.) Element tested the Heater independently (Mr. Bitar was not present for these tests) on two different occasions, and Mr. Bitar "witnessed the test being performed a third time and photographed the test independently." (Doc. #20-1 at 11:11–12:25; Doc. #20-2 at 2-3; Doc. #21-2 at 2-3.) Element provided a report of the procedures of the first two times that Element conducted the testing. (Doc. #21-3 at 1-2.) Based on the testing Mr. Bitar concluded that the "[H]eater of the bed bug cleaning

2

system failed to shut off after reaching the set temperature of 135 degrees Fahrenheit . . . ." (Doc. #20-2 at 3; Doc. #21-2 at 3.)

II.     Standard

Pursuant to Rule 702 of the Federal Rules of Evidence:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In determining whether expert opinion testimony is admissible, the trial judge must perform the gatekeeping role "of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms.*, Inc., 509 U.S. 579, 597, 113 S. Ct. 2786, 2799 (1993). "The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence." *Lauzon v. Senco Prod., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). "Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility[,] . . . [but when] the analytical gap between the data and proffered opinion is too great, the opinion must be excluded." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006).

In determining whether expert opinion testimony is reliable, the court must determine whether "'the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid.'" *Khoury v. Philips Med. Sys.*, 614 F.3d 888, 892 (8th Cir.

3

2010) (internal citations omitted). In assessing reliability, courts look to factors such as whether the theory or technique has been tested, whether it has "been subjected to peer review and publication[,]" whether the technique has a "known or potential rate of error[,]" and whether the theory or technique is generally accepted in the relevant community. *Daubert*, 509 U.S. at 593-94, 113 S.Ct. at 2797. These factors are not exclusive. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42, 119 S. Ct. 1167, 1171 (1999). The trial court has wide latitude in determining "how to test an expert's reliability . . . ." *Id.* at 152.

With respect to relevancy, the court must determine whether "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Civ. P. 702; *Daubert,* 509 U.S. at 591, 113 S. Ct. at 2795. "To satisfy the relevance requirement, the proponent must show that the expert's reasoning or methodology was applied properly to the facts at issue." *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010).

III. Discussion

Defendant argues that Mr. Bitar's opinions should be excluded because they are not reliable or based on reliable principles and methods. Additionally, Defendant argues that Mr. Bitar's opinions are speculative and based on erroneous assumptions of fact.

First, Defendant argues that Mr. Bitar's opinions are unreliable in part because Mr. Bitar never witnessed, observed or conducted the testing and merely relied upon the findings/results of a third-party. Rule 703 of the Federal Rules of Evidence, however, states that "[a]n expert may base an opinion on facts or data in the case that the expert *has been made aware* of or personally observed." Fed. R. Evid. 703 (emphasis added). Mr. Bitar, therefore, was entitled to rely on the report from Element in forming his opinion. Furthermore, Mr. Bitar personally witnessed one of

4

the procedures.  Therefore, the use of a third-party to provide testing does not make Mr. Bitar's opinions inadmissible.

Defendant next argues that Mr. Bitar's opinions are unreliable and therefore inadmissible because "the open or closed condition of the contactors on the Heater were never verified prior to or following any of Mr. Bitar's tests conducted in his IFIC office, prior to the chamber tests." (Doc. #20 at 5.)  Plaintiff points out that Mr. Bitar's method was "virtually identical to the method adopted by Defendant's own expert[.]"  (Doc. # 21 at 6.)  During his deposition, Mr. Bitar testified that he utilized the scientific method in investigating this matter, which required him to determine the problem, gather background information, explore all hypotheses to narrow down to a hypothesis, to conduct tests and record data, and finally to come to a conclusion based on the previous steps.  (Doc. #21-1 at 2:6-25.)

The scientific method is a well-known method that has been upheld numerous times in court.  *Daubert*, 509 U.S. at 593, 113 S. Ct. at 2796 (quoting E. Green & C. Nesson, *Problems, Cases, and Materials on Evidence* 649 (1983), for the proposition that "'[s]cientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry.'")  Reliability of the method, therefore, does not seem to be at issue.  Instead, it appears that Defendant is making the argument that the opinion is not relevant because the method was not properly applied to the facts of this case.  *See Barrett,* 606 F.3d at 980 (discussing the relevancy portion of the *Daubert* analysis).

Addressing Defendant's reframed argument that Mr. Bitar missed a "critical step in the proper testing of the Heater[,]" because he failed to verify that "the contactors on the Heater *prior to the chamber testing*[,]" becomes clearer under this lens.  (Doc. #22 at 4, 5.)  It is not the

5

methodology per se that Defendant objects to, but instead how it has been applied in this case. Herein lies an important distinction that Defendants seems to miss. Mr. Bitar and Defendant's expert diverge at the first step of the scientific process— determining the problem. The question (i.e. the problem) that Mr. Bitar was asking was whether or not the Heater failed to turn off as it was supposed to; in other words he was asking the what question (what happened). In discussing Mr. Bitar's report, the defense expert focused on the why question (why did it happen). For example, the defense expert stated that "[t]he procedure used to test the bug [H]eater within the chamber was not sufficient to determine **why** the bug [H]eater exceeded the setpoint temperature while inside the chamber. No steps were added to the procedure during the last Element test to determine **why** the bug [H]eater did not operate within the chamber as intended . . . ." (Doc. #21-5 at 11.) Because the what and the why questions are different, they will produce different procedures in testing the hypotheses.

Ensuring that the contact had not welded together may be important to answering the why question, but it does not help answer the what question. The only evidence that such a step is critical comes from that of the Defendant's expert who does not provide any discussion of why it is a critical step. (Doc. #20-3 at 10.) Instead, Defendant's expert opined that the "contacts had not welded together and caused continued operation of the heating elements beyond the setpoint temperature." (Doc. #21-5 at 11.) There is no information, however, that indicates the contacts welding together would be the only way that the Heater could have malfunctioned. Thus, the two expert opinions are asking different questions and the analyses are not mutually exclusive.

Defendant also argues that Mr. Bitar's opinions are speculative. At issue is Mr. Bitar's conclusion that "[t]his duplicated condition in the lab could easily led [sic] to the elevation in temperature in the hotel room leading to the activation of the sprinkler's head and damaging the

6

rooms due to water." (Doc. #20 at 7.) Defendant further argues that the opinion is speculation because "Mr. Bitar assumes the Heater malfunctioned and caused the fire sprinkler head to active[ate] merely because the chamber test demonstrated the Heater continued to heat after reaching the set point in the chamber test." (Doc. #20 at 7.) Mr. Bitar's opinion is not pure speculation. Mr. Bitar's report, as well as Element's report, details multiple tests run on the Heater where the Heater failed to shut off after reaching a certain temperature. Thus, Mr. Bitar's opinion is not "so fundamentally unsupported that it can offer no assistance to the jury." *Cole v. Homier Distrib. Co.*, 599 F.3d 856, 865 (8th Cir. 2010) (internal quotation marks omitted.)

Finally, Defendant argues that Mr. Bitar's opinion relies on erroneous assumptions of fact, namely that the sprinkler head was covered. (Doc. #20 at 7.) First, "'the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.'" *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 955–56 (8th Cir. 2007) (quoting *Bonner v. ISP Tech., Inc.*, 259 F.3d 924, 929 (8th Cir.2001)). Furthermore, as Plaintiff points out, it has never contended that the sprinkler head was covered and whether it was covered or not goes to potential comparative fault of the Plaintiff, not the admissibility of the opinion. (Doc. #21 at 9.) Therefore, whether the sprinkler head was covered or not is best left for the jury[1] to determine and to weigh Mr. Bitar's opinion accordingly.

Therefore, while there may be issues that can be raised on cross-examination, opinion evidence should not be excluded on such grounds. The preponderance of the evidence supports the admissibility of Mr. Bitar's opinions.

---

[1] The Court notes that the parties have agreed to a high-low agreement in which the parties agreed to certain sums of money depending on whether this Court rules in favor or against Defendant's *Daubert* Motion to Exclude the Testimony and Opinions of Ghattas Bitar. The parties' agreement, however, does not alter the analysis of this matter.

IV.     Conclusion

For the foregoing reasons, it is

ORDERED that Defendant's Daubert Motion to Exclude the Testimony and Opinions of Ghattas Bitar (Doc. #19) is DENIED.

*/s/ Lajuana M. Counts*
LAJUANA M. COUNTS
UNITED STATES MAGISTRATE JUDGE
